# Exhibit D

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

------------------------------------------------------------x

VENESSA DOBNEY,

                                 Plaintiff,           Index No.

                  - against -                    **COMPLAINT**
                                                        **JURY TRIAL DEMANDED**

THE WALT DISNEY COMPANY, AMERICAN
BROADCASTING COMPANIES, INC.
ELIZABETH BARRETT, and RICHARD
McHALE,

                                 Defendants.

------------------------------------------------------------x

       Plaintiff, Venessa Dobney, by and through her undersigned counsel, Kalmanson Cohen, PLLC, alleges the following upon personal knowledge as to her own acts, and upon information and belief as to all other matters.

## **NATURE OF THE CASE**

       1.      This is a civil action for declaratory, injunctive, and equitable relief, as well as monetary damages, seeking redress for Defendants' unlawful employment practices against Plaintiff, including their unlawful discriminatory retaliatory acts in violation of the New York State Human Rights Law, New York State Executive Law §§ 290 *et seq*. and the New York City Human Rights Law, Administrative Code of the City of New York §§ 8-101 *et seq*.

       2.      Defendant, The Walt Disney Company ("Disney"), the parent company of Defendant American Broadcasting Companies, Inc. ("ABC"),[1] is a large, prolific media company.  According to its website, Disney purports to be "committed to developing and retaining a diverse workforce [and] fostering a company culture that is welcoming and respectful…"

---

[1] Defendants Disney and ABC are collectively referred to as "the Company."  All the Defendants are collectively referred to as "Defendants".

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

3.      Contrary to Disney's public statements, Plaintiff, Venessa Dobney, a Black woman, worked in the Company's Finance Department supporting ABC News, for ten years, enduring sustained race-based discrimination, and then, retaliation for making protected complaints about those racial inequities culminating in her constructive discharge.

4.      Specifically, *inter alia*, Defendants denied Ms. Dobney managerial responsibilities and opportunities commensurate with her title and equal to those of non-Black counterparts, repeatedly passed her over for promotion in favor of less experienced non-Black employees, and chronically underpaid her as compared to her non-Black colleagues.

5.      Despite her repeated complaints, through both formal and informal channels, the Company never remedied the harm to Ms. Dobney.

6.      Instead, when Ms. Dobney reported the Company's race-based discrimination, the Company embarked on a retaliation campaign against her, assigning her a punishing amount of work that far exceeded that of any of her non-Black counterparts and that included work not commensurate with her title, refusing to give her opportunities for advancement within the Company, and then ***penalizing*** her for not having had the opportunities that they systematically denied her, disparaging her, and conducting a sham investigation.

7.      Consequently, on September 9, 2022, after ten (10) years of service, dedication, and hard work, the Company forced Ms. Dobney out as a result of its sustained intolerable, illegal, and debasing treatment and retaliation that went unabated despite Ms. Dobney's repeated pleas for correction.

## JURISDICTION AND VENUE

9.      The court has jurisdiction pursuant to CPLR §§ 301 and 302 because the Defendants regularly transact business in New York.

10.     Venue is proper under CPLR § 503(a) because at least one of the parties to this action resided in or had its principal office in New York County at the time of the commencement of this action. Additionally, causes of action that are the subject of this lawsuit arose in this County.

## PARTIES

11.     Plaintiff Venessa Dobney is a Black woman residing in, and a citizen of, the state of New Jersey.  She was employed by the Company in New York City as part of a finance team

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

supporting ABC News, from September 2012 to September 2022, at which point she was constructively discharged.

12.    Defendant Disney is incorporated in Delaware, headquartered in Burbank, California, and does business in New York State and New York City.

13.    Defendant ABC is incorporated in Delaware and does business in New York State. ABC's principal executive office is located at 77 West 66th Street in New York City.

14.    ABC is a subsidiary of Defendant Disney.

15.    At all relevant times, Defendants Disney and ABC met the definition of an employer under all applicable state and local statutes, as direct employers, or in the alterative, acting as a single employer in general, and specifically, with respect to Ms. Dobney.

16.    At all relevant times, Defendant Elizabeth Barrett ("Barrett") had supervisory and managerial authority and control over the terms and conditions of Ms. Dobney's employment, including promotional and staffing opportunities. Defendant Barrett served as the finance lead for supporting ABC News on the Disney Media & Entertainment Distribution ("DMED") team, among other senior level roles. She is currently the *Senior Vice President of Production and Operations for ABC News.*

17.    Upon information and belief, Defendant Barrett is a citizen of the state of New York. Defendant Barrett is a Caucasian woman.

18.    Defendant Barrett actively engaged in and aided and abetted discriminatory, retaliatory, and illegal acts against Ms. Dobney

19.    Defendant Richard McHale ("McHale") had supervisory and managerial authority and control over the terms and conditions of Ms. Dobney's employment, including promotional and staffing opportunities. At all relevant times, he served as the *Director of Financial Planning & Analysis, DMED*, supporting ABC News Broadcast, Digital & Longform Content, among other senior level roles.[2]

20.    Upon information and belief, Defendant McHale is a citizen of the state of New York.  Defendant McHale is a Caucasian man.

21.    Defendant McHale actively engaged in and aided and abetted discriminatory, retaliatory, and illegal acts against Ms. Dobney.

---

[2] Disney dismantled DMED in February 2023 and reorganized.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

22.     At all relevant times, Defendants Disney and ABC were a single employer in general and specifically, with respect to Plaintiff Dobney.

## FACTUAL ALLEGATIONS

23.     In September 2012, Ms. Dobney began working for the Company as a Senior Financial Analyst in the Disney/ABC Television Group's ("DATG") Finance Department, supporting ABC News.

24.     Ms. Dobney, joined the Company as a graduate of Rutgers University with five years of financial experience.  She was excited about the position, which she understood to promise her growth within a prestigious company and that appeared to prize her experience and potential.

25.     However, her expectations were thwarted by the Company's racially discriminatory treatment and its retaliation when she made complaints about racial inequities at the Company.

### The Company's Discriminatory Conduct

26.     In January 2016, Ms. Dobney was promoted in place to Manager.

27.     Immediately Ms. Dobney questioned why she had been appointed to "Manager" but had not been assigned any direct reports.

28.     The Company offered Ms. Dobney a variety of thin excuses.  For example, she was told that there purportedly was no headcount for her to supervise.

29.     None of these excuses withstood scrutiny.

30.     In September 2018, Ms. Dobney again raised concerns to Defendant Barrett that she did not have any direct reports.

31.     In that conversation, Ms. Dobney highlighted that she and two other women of color were the only "managers" in the Finance Department with token titles.

32.     Though Ms. Barrett acknowledged the need to address this disparity and gave lip service about being committed to doing so, the Company did not assign Ms. Dobney a direct report until 2019.

33.     In 2019, the Company reorganized the Finance Department, and Ms. Dobney began reporting to Defendant McHale.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

34.    Almost immediately, McHale was openly hostile to Ms. Dobney. In an introductory meeting, McHale essentially shut the door on the possibility of any advancement, telling Dobney: "There was not going to be movement anytime soon."

35.    McHale was aggressive and verbally abusive to Ms. Dobney without reason or provocation, treating her differently from her non-Black counterparts.

36.    For example, he yelled, cursed, and belittled her. McHale also refused to provide Ms. Dobney with an office commensurate with her title or with those of her non-Black counterparts, among other slights.

37.    In addition, McHale did not give Ms. Dobney the same responsibilities or opportunities as her non-Black colleagues, such as interviewing candidates for the team. He also criticized her more than non-Black counterparts though she was conscientious, and her work was excellent.

38.    As a result, Ms. Dobney again sought assistance from Ms. Barrett, and then from employee relations ("ER"). They did nothing.

39.    Ms. Dobney was not alone in experiencing McHale's animus toward Black employees. Prior to and during the early months of the reorganization, the only two other Black employees left the Finance Department as a result of McHale's targeted mistreatment of them.

40.    Despite these troubling red flags, Ms. Barrett did nothing, tacitly endorsing McHale's racist conduct by failing to stop it.

41.    In 2019, Ms. Dobney was finally assigned one direct report–three years after having become a "Manager," at least in title. But the assignment was a sham. Ms. Dobney's direct report, an employee already with the Company, had a full portfolio of existing work - accounts payable, accounts receivable, and other work that was not within Ms. Dobney's workflow. Instead of providing support, the direct report added to Ms. Dobney's burgeoning workload.

42.    In truth, the move only benefited Ms. Barrett, making her good to "show" she had a growing group of direct and indirect reports under her.

43.    Ms. Dobney nonetheless took her role as manager seriously.

44.    Ms. Dobney continued to mentor and train the employee.

45.    By March 2020, Ms. Dobney was the only Black employee remaining in the Finance Department. Around that time, McHale cursed and yelled at her during a Zoom call,

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

criticizing work that another manager had already approved.    It was humiliating and traumatizing.

46.    In April 2020, after Ms. Dobney made multiple reports to the Company about McHale's mistreatment, McHale begrudgingly and insincerely apologized to Ms. Dobney for his behavior.

## McHale Retaliates Against Ms. Dobney for Making Protected Complaints.

47.    In addition to continuing to discriminate against her, McHale began to retaliate against Ms. Dobney for making protected complaints against him.

48.    Ms. Dobney did not yield to McHale's efforts to silence her protected complaints. Between the summer of 2020 and the spring of 2021, Ms. Dobney complained—repeatedly—to Disney's Human Resources Department about the unfair manner in which she was being treated.

49.    In March 2020, Ms. Dobney formalized her complaint with Disney's Employee Relations team.

50.    In July 2020, McHale tasked Ms. Dobney with participating in his campaign of discrimination and retaliation against people of color.    Specifically, McHale instructed Ms. Dobney to manage out her direct report who was an employee of color.    He directed her to "specifically find every mistake [she makes and], keep a record, so we can put her on a performance plan."

51.    Ms. Dobney did not believe that her direct report had any performance issues requiring "management."    Rather, McHale's instruction was unsupported and came on the heels of *that* employee's complaint to Human Resources about unfair treatment and favoritism.

52.    In July 2020, per McHale's instructions, Babette Romaine, Senior Manager of Financial Planning and Analysis, met with Ms. Dobney to review her job responsibilities, though she had been a manager for more than four (4) years.

53.    Ms. Romaine offered no explanation for the meeting; Ms. Dobney's job had not changed, she had no performance issues, the meeting was not conducted in relation to a performance evaluation, and she had not previously been subjected to any such discussion during her tenure with the Company.

54.    Ms. Romaine acknowledged that Ms. Dobney's non-Black counterparts had not been subjected to the same discussion even though these individuals were more junior in their

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

positions. Ms. Dobney again expressed discomfort in how she was being treated as compared to her non-Black counterparts.

55. In August 2020, the Company validated Ms. Dobney's complaints that she was being treated less favorably than her non-Black counterparts, but its response was patronizing and anemic.

56. Carla Collins, Employee Relations Manager for Disney Television, told Ms. Dobney she was "lucky" to be in a department that wanted to "learn to do better" and that the Company was sending the leadership team to management training to rectify the situation.

57. These promised improvements proved to be nothing but lip service.

58. The Company, aware of McHale's willful and retaliatory intransigence did nothing.

59. Further, by late 2020, in spiteful retribution for her complaints about racial disparities, McHale had doubled Ms. Dobney's responsibilities with no additional staff.

60. In making these assignments, McHale was setting Ms. Dobney up to fail; Ms. Dobney was now doing the job of more than three people. It was neither manageable nor sustainable. Nevertheless, Ms. Dobney's performance was beyond reproach, and that assessment was reflected in her performance reviews.

61. During these months, the Company acknowledged that Ms. Dobney, who was pregnant at the time, had a workload that exceeded the capacity of one employee.

62. At this time, Ms. Dobney had a spiraling workload comprised of both junior analyst work and managerial level work with no reprieve and no support.

63. Ms. Dobney's non-Black counterparts did not suffer the same over burdened work load, nor a healthy workload without having proper support in place.

64. Despite this extraordinary plate of responsibilities, Ms. Dobney *still* excelled at her job.

65. Still, the crushing, around-the-clock workload caused Ms. Dobney great anxiety and emotional distress, ultimately sending her into early labor. She delivered her baby several weeks early.

66. By early 2021, two non-Black counterparts (an Asian woman and a Caucasian male) on Ms. Dobney's team with the same title of "Manager confirmed that McHale was

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

burdening Ms. Dobney with far more work than was being asked of them. Each of those individuals also had direct reports to whom to delegate junior level analyst tasks.

67.      Accordingly, Ms. Dobney *again* brought her concerns to Disney's Human Resources with documentation evidencing the disparate workloads.

68.      In an apparent effort to silence any future complaints, McHale then berated Ms. Dobney about having reported to Human Resources that she was being set up for failure, and stated that Ms. Dobney "makes it difficult for him to give her opportunities."

69.      In or around September 2021, Ms. Dobney complained to Ms. Barrett, who was the then-finance lead for ABC News on the DMED team, that despite Ms. Dobney's exceptional performance with an ever-growing workload, she had not been rewarded in any manner.

70.      In that conversation, Ms. Dobney complained that she was being boxed in by Mr. McHale – her manager—who was retaliating against her for making protected complaints against him.

71.      Ms. Dobney further informed Ms. Barrett that she wanted to be promoted to a Senior Manager position in recognition of her contributions.

72.      In response, Ms. Barrett told Ms. Dobney that there was no headcount available to promote her, and that in any event, promotions are not granted absent an expansion to an employee's workload.

73.      This was false.

74.      The Company's refusal to promote Ms. Dobney was racially-motivated.

75.      One week after Ms. Barrett declared that promotions in place (purportedly) did not happen at the Company, the Company created a new headcount to promote Euris Peña.

76.      Mr. Peña is a male employee who had been with the Company for a little over a year. He was promoted into the exact role that Ms. Dobney had sought–Senior Manager.

77.       The position had not been advertised and Ms. Dobney had not been given an opportunity to interview or apply for it. In contrast, Mr. Peña and another employee had been notified of the position and invited to interview.

78.      Moreover, around the same time, Leah Auster, a Caucasian woman and another relatively short-term employee, was also promoted in place, to Director.

79.      Neither Peña nor Auster had expansions to their workload. Nor did either have Ms. Dobney's experience within the Company to justify their promotions ahead of Ms. Dobney.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

80.     Rather—the commonalities between Mr. Peña and Ms. Auster were that they were not Black and had not voiced concerns about the Company's racial inequities.

81.      In response, Ms. Dobney escalated her complaints to ABC Executive Vice President, Derrick Medina who promised to inquire.

## Ms. Dobney Gives Birth Prematurely; McHale's Retaliation and Discrimination Continue During her Protected Leave.

82.     In late 2021, that Dobney went into premature labor and went out on maternity leave.

83.     During her maternity leave, McHale purported to "invite" Ms. Dobney to interview for two Senior Manager roles that had become available.

84.     But Ms. Dobney was an obvious choice for the Senior Manager for Digital role, and she should not have had to "interview" for it.

85.     Specifically, Ms. Dobney had hired and trained the team that the new Senior Manager for Digital would oversee and who were going to be assigned a portion of the larded workflow for which Ms. Dobney had long been responsible. Ms. Dobney also had strong relationships with the business partners with whom that Senior Manager would work. Indeed, those business partners relied on the standardized reporting and metrics that Ms. Dobney had, herself, developed.

86.     Nevertheless, she "applied" for the digital Senior Manager role, interviewing only with McHale, the very individual who had retaliated against her after she complained about him having discriminated against her

87.     Ms. Dobney did not get the Senior Manager job.

88.     The blow to her confidence and self-esteem was crushing.

89.     Instead, the Company appointed Eric Levin to the Senior Manager role.   Mr. Levin is a Caucasian male without the requisite experience for the position.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

90.     Ms. Dobney sought clarity from Ms. Barrett who touted Mr. Levin's experience (which was false) and also cited amorphous "performance issues" as the patently pretextual basis for the denial of this promotion.[3]

91.     In a moment of candor, Mr. Levin shared with Ms. Dobney that the Senior Manager for Digital role was quite different from the majority of his experience.

92.     Ms. Barrett could not describe any specific performance deficiencies, and in fact, Ms. Dobney had never received anything but positive performance feedback and reviews, both oral and written.

93.     Then, adding insult to injury, McHale offered Ms. Dobney another so called "opportunity"—namely, that she could _interview_ for a _lateral_ Manager role that would be reporting into the Senior Manager role that she had just been denied.

94.     No other person reporting to McHale had ever been made to "interview" for a lateral role.

95.     Indeed, upon information and belief, no other person on McHale's team had ever been made to interview for any promotional opportunities within the team.

96.     McHale's process for selection for the Senior Manager and Manager positions were patently discriminatory and retaliatory.

**Ms. Dobney Was Paid Less than her Non-Black Counterparts**

97.     Despite Ms. Dobney's excellent work, expansive workload, and many contributions to the Company, the Company still chronically underpaid her as compared to her non-Black counterparts.

98.     Upon information and belief, the Company paid Ms. Dobney less than her non-Black counterparts starting in 2012, when she first started with the Company and throughout the years that followed.

99.     Had Ms. Dobney been properly advanced throughout her tenure with the Company, she would have enjoyed higher earning potential, bonuses and other benefits.

---

[3]  Mr. Medina shared that Ms. Barrett had also smeared Ms. Dobney to Mr. Medina, baselessly portraying her as an underperformer, seemingly in an attempt to justify Ms. Dobney's mistreatment.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

100.    Except for executive compensation, the Company did not make salaries transparent.

101.    When New York City's Salary Transparency Law went into effect in 2022, Ms. Dobney's suspicion was essentially confirmed.

## The Company Constructively Terminates Ms. Dobney

102.    Ms. Dobney returned from leave in August 2022, with false attacks on her performance having been made, no path to promotion in sight, and confirmation that she was being paid less than her non-Black counterparts for having performed far more work.

103.    Ms. Dobney was forced to continue to do the work of the Senior Manager (the role that she was officially denied promotion to) while Mr. Levine was offered the grace of time to learn how to perform the role.

104.    Ms. Dobney was also stuck working for the same leadership that had already branded her as a problem and who had engaged in relentless discrimination and retaliation against her with no mechanism in place for true redress.

105.    Forced out because of the intolerable conditions taking a toll on her physical and mental health, Ms. Dobney was constructively discharged in September 2022.

## The Corporate Defendants Are a Single Employer Under the Law

106.    Ms. Dobney was employed by both Disney and ABC and they are jointly responsible for the discriminatory, retaliatory, and illegal acts against Ms. Dobney.

107.    Disney and ABC are a single employer with (1) interrelated operations (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control.

108.    Disney and ABC operations are interrelated: Disney owns the Upper West Side building that houses ABC and other Disney channels and in which Ms. Dobney worked. Interior signage in the building prominently displayed Disney's logo and its ownership of ABC and other channels.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2    Case 1:23-cv-05380-UA   Document 1-4   Filed 06/25/23   Page 13 of 21

RECEIVED NYSCEF: 06/23/2023

109.     During Ms. Dobney's tenure, Disney engaged in a number of reorganizations. Each iteration of the Disney company structure reflects Disney's firm hand in ABC's operations and the deep operational connections between Disney and ABC4

110.     As an example, in October 2020, Disney announced with great fanfare that it was centralizing distribution and commercialization activities of all of Disney's media and entertainment operations (including ABC and ABC News) into a single, global business segment called Disney Media & Entertainment Distribution ("DMED").

111.     Disney's press release announcing the DMED states, "…. The Media and Entertainment Distribution group… will be responsible for the P&L [profit and loss] management and all distribution, operations, sales, advertising, data and technology functions worldwide for all of the Company's content engines, and it will also manage operations of the Company's streaming services and domestic television networks. . . ."

112.     DMED was responsible for all monetization of content. Disney's SEC Form10-K filing summarizes, "DMED has full accountability for the financial results of Disney's entire media and entertainment business".

113.     Ms. Dobney was engaged in financial analysis supporting ABC and thus did core work of this newly organized Disney-run segment.

114.     Disney's labor relations are centralized.

115.     Jobs at Disney, including those at ABC, are posted on a centralized Disney website: https://jobs.disneycareers.com. The Disney careers homepage page does not reference ABC.

116.     In fact, when Ms. Dobney first applied for the position that allowed her to join the Company, the job posting was through the Disney career website.

---

[4] The interrelationship of Disney and ABC operations and leadership has continued beyond Ms. Dobney's tenure. On February 3, 2023, Disney announced a restructuring of Disney into three principal business components: Disney Entertainment, ESPN, and Disney Parks, Experiences and Products. The co-chair of Disney Entertainment would have "have primary oversight of the following businesses and content brands: ABC Entertainment, ABC News, ABC Owned Televisions Stations, Disney Branded Television, Disney Television Studios, Freeform, FX, Hulu Originals, National Geographic Content, and Onyx Collective." https://thewaltdisneycompany.com/the-walt-disney-company-announces-strategic-restructuring-restoring-accountability-to-creative-businesses/

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

117.     After receiving an offer letter on September 5, 2012, Ms. Dobney received an email from Disneycareers soliciting additional information.

118.     On September 21, 2012, Ms. Dobney received a congratulatory email from "Disneycareers" that stated, "Congratulations on your new position with The Walt Disney Company, "and referred her to "the Walt Disney New Hire Portal."

119.     The onboarding portal is one component of a centralized portal maintained by Disney for the entire Disney company, including its subsidiaries, with benefits information, policies, and other information.

120.     Disney-wide benefits such as access to Disneyplus, benefits at the Disney store, free tickets to Disney parks, health benefits, and family medical leave, are all administered by Disney or through Disney vendors. For example, a company-wide retirement plan is administered by Fidelity Investments through the "Disney Add It Up! Benefits Center."

121.     A Disney company-wide Human Resources team is responsible for personnel-related records and actions, such as updating personnel records for former employees and providing W2 forms.

122.     Paychecks are issued to ABC employees through a Disney common vendor.

123.     Disney centralized staff addressed Ms. Dobney's human resources complaints and questions, including those regarding parental leave, health benefits, and termination.

124.     Human Resources assistance was not available to Ms. Dobney in the New York City office or through ABC directly.

125.     Disney corporate-wide policies, such as its: Standards for Business Conduct and Employee Policy Manual bearing the Disney logo are applicable to all employees, including those at ABC.  Ms. Dobney was subject to those policies and was required to take Disney's annual training.

126.     Disney sets company-wide employee relations policies. For example, Disney opposed salary transparency and resisted reporting both median and adjusted pay gaps across race and gender at the highest company levels. As a result, Ms. Dobney did not have access to official data that could have identified salary discrepancies between her and her non-Black colleagues.  Instead, she relied on the transparency of her colleagues who informed her that she was earning less than they were.  It was completely and utterly humiliating.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

127.    Disney boasts numerous Company-wide personnel initiatives. For example, according to Disney's website, Disney's Senior Vice President, Chief Diversity Officer, appointed in 2017 "…. leads the Company's strategic diversity and inclusion initiatives, helping Disney and its employees around the world tell stories that entertain, enlighten and inspire…to build on Disney's commitment to produce entertainment that reflects a global audience and sustains a welcoming and inclusive workplace for everyone."

128.    Disney's Human Resources and Employee Relations personnel in California handled Ms. Dobney's informal and formal complaints. No Human Resources staff assigned to ABC or located in New York City dealt with Ms. Dobney's formal or informal discrimination complaints.

129.    Between March and July 2020, Ms. Dobney spoke repeatedly to Carla Collins, Employee Relations Manager for Disney Television, about the unfair and discriminatory conduct she was facing. Ms. Collins' September 2020 response failed to remedy the situation.

130.    Between June 2020 and May 2021, Ms. Dobney regularly communicated with Beth Rapadas, Disney Human Resources Business Partner about her situation. Nothing changed.

131.    In May 2022, Monica Steinberg, Human Resources Director, DMED, reached out to Ms. Dobney, describing herself as the new Human Resources business partner for DMED. Ms. Dobney described her situation. Ms. Steinberg told her Employee Relations would reach out to her.

132.    In May 2022, Ms. Dobney met with Ginger Vega of Disney Employee Relations. Shockingly, Vega said she had no background on Ms. Dobney and that there were no records related to Ms. Dobney.

133.    Vega said she would have to start the investigation anew.

134.    Four months later, Vega had not completed the investigation.

135.    Disney failed to properly investigate Ms. Dobney's complaints and take or recommend appropriate action to remove or discipline McHale and Barrett. Disney failed to provide redress for Ms. Dobney.  As a result, Ms. Dobney suffered life altering depression, shame and anxiety.

136.    Disney shares common management with ABC.

137.    Disney and ABC share a single Board of Directors.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

138.    Centralized company management is responsible for coordination between the various segments and oversight by Disney. Groups are headed by executive leaders who report directly to the Disney CEO.

139.    The leadership of DMED is illustrative. Disney oversaw DMED. Disney's Kareem Daniel was Chairman of the DMED.

140.    McHale reported to Barrett, who reported to Greg Richart, Senior Vice President, Finance & Business Planning for DMED, who in turn, reported to Bryan Castellani, Executive Vice President, Finance, DMED.

141.    Upon information and belief, McHale regularly reported through this chain of command.

142.    Disney and ABC share common ownership and Disney exercises financial control over ABC.

143.    Disney owns ABC. Disney is a publicly-traded company and is owned by shareholders that reportedly include financial institutions, institutional investors, and individual investors.

144.    Upon information and belief, Disney draws substantial revenue from ABC's advertising and affiliate fees.  Ms. Dobney was regularly in attendance at meetings during which ensuring shareholder profitability was discussed.

145.    ABC News is subject to Disney directives to reduce budgets and headcounts.

146.    As an example, Disney's chair announced in February 2022 that there would be 7,000 layoffs across the entire Company, highlighting Disney's financial control over its subsidiaries.

147.    By way of another example, in March 2023, Kim Godwin, President of ABC News announced implementation of the Company-wide layoffs, stating, "Throughout the company, teams are being impacted by the downsizing that was announced several weeks ago, including our own ABC News family. While these actions are never easy, they are a necessary step to ensure we're on solid footing for the years ahead as we chart a sustainable, growth-oriented path forward for the entire organization."

## FIRST CAUSE OF ACTION:

### Discrimination in Violation of the New York State Human Rights Law

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

148.     Dobney repeats and realleges each allegation set forth above.

149.     Defendants unlawfully discriminated against Dobney in the terms and conditions of her employment by subjecting her to disparate treatment and adverse actions including constructive discharge in violation of the New York State Human Rights Law, N.Y. Exec Law § 296(1) ("NYSHRL").

150.     As a result, Dobney has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

151.     Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Dobney's rights.

152.      Dobney is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

## SECOND CAUSE OF ACTION:

### Retaliation in Violation of the New York State Human Rights Law

153.     Dobney repeats and realleges each allegation set forth above.

154.     Defendants retaliated against Dobney for her protected discrimination complaints in violation of the NYSHRL, N.Y. Exec Law § 296(7).

155.     The retaliatory actions to which Dobney was subjected could have dissuaded reasonable employees in her position from complaining of discrimination.

156.     As a result, Dobney has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

157.     Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Dobney's rights.

158.      Dobney is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

## THIRD CAUSE OF ACTION:
### Aiding and Abetting in Violation of the New York State Human Rights Law
(Against the Individual Defendants)

159.     Dobney repeats and realleges each allegation set forth above.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2    Case 1:23-cv-05380-UA   Document 1-4   Filed 06/25/23   Page 18 of 21

RECEIVED NYSCEF: 06/23/2023

160.    Defendants Barrett and McHale engaged in an unlawful discriminatory practice by knowingly and/or recklessly aiding, abetting, compelling, coercing and/or actively participating in the unlawful, discriminatory, and retaliatory conduct in violation of the NYSHRL, N.Y. Exec. Law § 296 (6)

161.    As a result, Dobney has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

162.    Defendants Barrett and McHale willfully engaged in discriminatory practices with malice and/or reckless indifference to Dobney's rights.

163.    Dobney is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and cost.

## FOURTH CAUSE OF ACTION:
### Discrimination in Violation of the New York City Human Rights Law

164.    Dobney repeats and realleges each allegation set forth above.

165.    Defendants unlawfully discriminated against Dobney in the terms and conditions of her employment by subjecting her to disparate treatment and adverse actions including constructive discharge on the basis of her race, in violation of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1)(a) ("NYCHRL").

166.    As a result, Dobney has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

167.    Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Dobney's rights.

168.    Dobney is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

## FIFTH CAUSE OF ACTION:
### Retaliation in Violation of the New York City Human Rights Law

169.    Dobney repeats and realleges each allegation set forth above.

170.    Defendants retaliated against Dobney for her protected discrimination complaints in violation of the NYCHRL, N.Y.C. Admin. Code § 8-107(7).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 2   Case 1:23-cv-05380-UA   Document 1-4   Filed 06/25/23   Page 19 of 21
RECEIVED NYSCEF: 06/23/2023

171. The retaliatory actions to which Dobney was subjected could have dissuaded reasonable employees in her position from complaining of discrimination.

172. As a result, Dobney has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

173. Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Dobney's rights.

174. Dobney is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

## SIXTH CAUSE OF ACTION:
### Aiding and Abetting in Violation of the New York City Human Rights Law
(Against the Individual Defendants)

175. Dobney repeats and realleges each allegation set forth above.

176. Defendants Barrett and McHale engaged in an unlawful discriminatory practice by knowingly and/or recklessly aiding, abetting, compelling, coercing and/or actively participating in the unlawful, discriminatory, and retaliatory conduct in violation of the NYCHRL, N.Y.C. Admin. Code § 8-107(6).

177. As a result, Dobney has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

178. Defendants Barrett and McHale willfully engaged in discriminatory practices with malice and/or reckless indifference to Dobney's rights.

179. Dobney is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

## SEVENTH CAUSE OF ACTION:
### Supervisor Liability under the New York City Human Rights Law
(Against the Walt Disney Company and ABC)

180. Dobney repeats and realleges each allegation set forth above.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

181.     NYCHRL, N.Y.C. Admin. Code § 8-107 (13)(b) provides for an employer's vicarious liability for unlawful discriminatory conduct of an employee or agent where the employee or agent "exercised managerial or supervisory authority" over the plaintiff; the employer knew of such conduct and either acquiesced in or failed to take immediate and appropriate corrective action; or the employer should have known of the discriminatory conduct and "failed to exercise reasonable diligence to prevent such discriminatory conduct

182.     The Corporate Defendants are vicariously liable for Defendant Barrett's and McHale's discriminatory, retaliatory, and unlawful acts against Ms. Dobney.

183.     As a result, Dobney has suffered emotional distress and has incurred compensatory damages, economic damages, attorney's fees, and costs.

184.     Dobney is entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

## **PRAYER FOR RELIEF**

Wherefore, the Plaintiff prays that the Court enter judgment and relief as follows:

a.     Declaring that the acts and omissions complained of herein are unlawful and violate the NYSHRL, and the NYCHRL;

b.     Awarding damages to Plaintiff, in an amount to be determined at trial, for lost opportunities and for failure to compensate her properly, and to otherwise make Plaintiff whole for any losses suffered as a result of Defendants' actions;

c.     Awarding Plaintiff compensatory damages, in an amount to be determined at trial for humiliation, mental anguish, and emotional distress;

d.     Awarding Plaintiff punitive damages in an amount to be determined at trial;

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 06/23/2023

Case 1:23-cv-05380-UA   Document 1-4   Filed 06/25/23   Page 21 of 21

e.      Awarding Plaintiff attorney's fees, costs, and expenses incurred in the prosecution of this action; and

f.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy Defendants' actions.

Dated: June 23, 2023
New York, New York

KALMANSON COHEN, PLLC

_____/s/ Randi M. Cohen_____
Randi M. Cohen
Marla Tepper
Kalmanson Cohen PLLC
165 Broadway, 23rd Floor
New York, NY 10006
T: (631) 806 3762 | F: 646 513 2936
Randi@kalmansoncohen.com
marla@kalmansoncohen.com
http://www.kalmansoncohen.com
*Attorneys for Plaintiff, Venessa Dobney*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.